IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GRAY V. GRAY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JAMES M. GRAY II, APPELLANT,

V.

CHRISTA M. GRAY, APPELLEE.

Filed April 16, 2024.    No. A-23-571.

Appeal from the District Court for Kimball County: DEREK C. WEIMER, Judge. Affirmed.

Jessica M. Laughlin and Robert M. Brenner, of Robert M. Brenner Law Office, for appellant.

Rhonda R. Flower, of the Law Office of Rhonda R. Flower, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

James M. Gray II appeals from the Kimball County District Court's order granting Christa M. Gray's complaint for modification of child custody and her request to remove the parties' child from Nebraska to Wyoming. James argues that the district court erred in finding that Christa satisfied her burden of proving that a material change in circumstances had occurred since the entry of the initial decree, that Christa had a legitimate reason to relocate, and that it was in their child's best interests to modify physical custody and grant Christa's request to remove the parties' minor child to Wyoming. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. DISSOLUTION OF MARRIAGE

James and Christa are the biological parents of Conner Gray, who was born in October 2018. Conner was born during the parties' marriage when they were both living in Cheyenne, Wyoming. The parties resided together in Cheyenne for 4 years before moving to Kimball, Nebraska. At the time that the parties moved to Nebraska, Conner was 2 months old. The parties separated in December 2020 after which Christa and Conner returned to Cheyenne. At some point thereafter, a complaint for dissolution was filed in the Kimball County District Court.

In January 2021, while the complaint was pending, James obtained a protection order in Wyoming against Christa following her arrest for domestic assault. The assault, which occurred in front of Conner, happened during a fight with James while Christa was driving a car. As a result of the protection order, James was awarded custody of Conner subject to Christa's supervised parenting time. Christa's parenting time remained supervised until April 2021.

A month later, in May 2021, the Kimball County District Court entered a decree of dissolution pursuant to the parties' settlement agreement. The district court awarded the parties joint legal and joint physical custody of Conner on a week on/week off basis. Notably, when the dissolution decree was entered, Christa resided in Cheyenne and James resided in Kimball.

The parties operated under the week on/week off joint physical custody arrangement until July 2021. At that time, due to James' alcohol use, Christa became concerned for Conner's safety when in James' care. Due to those concerns, Christa moved in with James in Kimball until she obtained her own apartment in October 2021. Even after Christa and Conner moved to her apartment, the parties frequently stayed with each other, and Christa had a key to James' house.

In April 2022, due to Christa's continued concerns about James' alcohol use while caring for Conner, the parties began operating under what they refer to as a memorandum agreement. Pursuant to this agreement, James agreed to forgo his overnight visitation on the weekends as awarded in the dissolution decree and agreed to a safety plan in the event that he decided to drink alcohol. The parties utilized this agreement until Christa filed a complaint to modify custody, child support, and parenting time in June 2022.

### 2. COMPLAINT TO MODIFY

In her complaint to modify, Christa alleged that since the entry of the dissolution decree, there had been material changes in circumstances affecting Conner's best interests including:

- James' history of alcohol use/abuse, which had escalated since the entry of the dissolution decree;
- James leaving his home to go drinking, leaving Conner alone;
- James' Wyoming arrest for driving under the influence (DUI) while his older child from a previous marriage was in the vehicle;
- James' family members having found him passed out while Conner was in his care;
- The parties having informally agreed to vary from the court- ordered parenting plan for Conner's safety including provisions providing for no overnight visitation if James was not working the next day and that James would contact Christa in the

event that he drank during his parenting time and, under those circumstances, his parenting time would end immediately;

- James having, on numerous occasions, opted not to take Conner for his parenting time under the parties' informal agreement;
- James' work schedule often requiring him to be out of town overnight which made it difficult for him to adhere to either the court-ordered visitation plan or the parties' informal plan;
- Christa having Conner the majority of the time for the last several months due to these circumstances; and
- James failing to provide adequate care for Conner during his parenting time which resulted in Conner being left in dirty diapers for extended periods of time and being left unsupervised while James was passed out.

Christa alleged that modification of the decree was in Conner's best interests and requested that the court award her sole legal and physical custody of Conner subject to James' parenting time.

### 3. REQUEST FOR REMOVAL

In October 2022, Christa filed a request to remove Conner from Nebraska to Wyoming. She asserted, inter alia, that she had family and an extensive support system in Cheyenne; that all of Conner's doctors were located in Cheyenne; and that Conner would have better educational opportunities in Cheyenne. James objected to Christa's application to remove Conner from the State.

### 4. PROTECTION ORDER AGAINST JAMES

In November 2022, Christa filed for a protection order against James that resulted in James being unable to see Conner for approximately 1 month.

### 5. TRIAL

The trial was held in May 2023. Testimony was adduced from witnesses including the parties; Sandra Raney, a mental health substance abuse counselor; and Caitlin Tabor, Conner's preschool teacher and daycare director.

The evidence established that the parties met when they were both residing in Cheyenne, Wyoming. They lived together in Cheyenne for approximately 4 years before moving to Kimball, Nebraska, where they resided until they separated in December 2020. Following the parties' separation, Christa moved back to Cheyenne, where she resided at the time the dissolution decree was entered in May 2021, based on the parties' settlement agreement.

Christa testified that she remained in Cheyenne until she began having concerns for Conner's safety while in James' care. Christa testified that although she was aware that James struggled with alcohol issues, James' drinking escalated following the entry of the divorce decree. For example, in June 2021, after James drove to his mother's home while intoxicated and refused to allow Conner to stay with her, James' mother contacted Christa, who was residing in Cheyenne, out of concern for Conner's safety. Christa also testified that on a couple occasions, she went to James' house during his parenting time and observed James either intoxicated or passed out while

serving as Conner's sole caregiver. Additionally, Christa testified, and James admitted, that James had acknowledged that on at least one occasion, he left Conner home alone so he could go to a bar. Then, on June 29, 2021, James was arrested in Cheyenne for an improper child safety restraint system, for parking on a controlled access highway, and for DUI with a child passenger. The charges occurred after James, who was intoxicated, picked up his child from a prior relationship for parenting time. As a result of these charges, James was placed on probation.

Following James' arrest, Christa testified that out of concern for Conner, she moved back to Kimball and resided with James. During the period of time that Christa resided with James in Kimball, he continued to drink alcohol. Christa testified that on at least one occasion she left work because James was not responding to text messages. When she arrived at home, James had passed out from intoxication, she could smell alcohol on him, and James was not caring for Conner.

In October 2021, Christa and Conner moved into an apartment in Kimball. James' drinking continued and in April 2022, Christa became concerned that James was drinking while caring for Conner. James' mother and Christa both testified that they went to James' house at 1 a.m. and found James intoxicated and playing video games with Conner with James' other son awake in the same room. Christa observed firearms on the floor easily accessible to the children. Christa removed Conner from the home, but James was unwilling to allow his mother to take his other son. Christa testified that the following day, when she returned to James' home, he was still intoxicated and smelled of alcohol. James refused Christa's offer to drive James' other son to James' mother's home and, even though James was intoxicated, he drove the child to his mother's home.

Following this incident, the parties entered into a memorandum agreement modifying the parenting plan schedule and providing a safety plan in the event James started drinking. The parties operated under this agreement until June 2022 when Christa filed her complaint to modify. James testified that when Christa filed the complaint to modify, he was halfway through his sentence of probation and had been having negative alcohol tests. Thereafter, the parties resumed the week on/week off parenting plan schedule as set forth in the initial decree.

Christa testified that in October 2022, she filed a motion seeking to remove Conner from Nebraska so she and Conner could move back to Cheyenne. Christa testified her reasons for wanting to move back to Cheyenne were her entire family resided there, Conner would have better life experiences, Conner's pediatrician was there, she had been unable to get Conner into counseling in Kimball, and there were more resources in Cheyenne. Christa argued that Kimball is only about an hour drive from Cheyenne and that James' relationship with Conner would not be hindered by her move. She stated that James' other son also resides in Cheyenne and James generally picks up that child for visits on Fridays in Cheyenne.

During the trial, James admitted that his drinking was a problem, that he drank while the children were in his care, that he continued to drink following his arrest for DUI, that he had opted out of his parenting time under the safety plan on numerous occasions because he wanted to drink, and that he admitted to Christa that he left Conner home alone to go to the bar. However, James stated that as of the time of the trial, he had been sober for almost a year. He further testified that although he completed a substance abuse evaluation between June and December 2022, his treatment for alcohol use consisted primarily of a prescription medication. James acknowledged that he was not currently engaged in either an inpatient or outpatient substance abuse program, he

was not attending A.A., he had not met with a counselor other than the substance abuse evaluation, and he did not have a sponsor.

Despite his prior alcohol abuse, James testified that he did not believe relocating to Cheyenne was in Conner's best interests. He argued that Conner was involved in activities in Kimball, that he had a close relationship with his paternal grandmother, that Conner liked his school, and that Conner had friends in Kimball. He further stated that based on his experience with the parenting plan with his other child who resided in Cheyenne, he believed that his relationship with Conner would be negatively impacted by allowing Conner to relocate to Cheyenne. James testified that he had no intention of relapsing, but if he did relapse, the parties could enter into an agreement similar to their previous agreement.

Raney, a substance abuse and mental health counselor, testified that she believed that if a child was accustomed to a 50/50 custody arrangement, that custody arrangement should continue due to the potential negative impacts a change could have on the child. However, Raney acknowledged that the safety of the child is paramount and that she would be concerned if a parent was drinking to the point of intoxication and was passing out while caring for a child, was driving while intoxicated with a child in the vehicle, or had the children up at 2 a.m. while the parent was drinking in a room with firearms easily accessible to the children.

Tabor testified that Conner was doing well in school, that he was very smart, that he made friends easily, and that he was a good artist. She testified that both Christa and James participated during the most recent parent-teacher conference. Tabor testified that at the time of the trial, Conner generally appeared to be more tired coming from Christa's home compared to James' home and that Conner had been falling asleep in class more often in the weeks preceding the trial.

James testified that he and Christa get along well, that they are able to coparent effectively, and that they keep each other informed regarding Conner. Christa did not dispute that they were able to communicate well or that James was willing to enter into an agreement or opt out of parenting time when he had been intoxicated.

In June 2023, the district court awarded Christa primary physical custody of Conner and granted her request to remove Conner from Nebraska to Wyoming. Specifically, the district court found

> that the evidence shows that shortly after the entry of the Decree, [James] was found to be drinking and driving a motor vehicle with his child from another relationship . . . in the vehicle. He was convicted of some type of criminal charge related to this offense. He was sentenced in Wyoming in January 2022. [Christa] also demonstrated that on at least three occasions, [James] was drinking to intoxication with one or more of his children present. [Christa] further demonstrated that during this time [the parties] would modify the parenting time so that [James] could consume alcohol and Conner could be with [Christa]. [James] asserts that he has not had any alcohol in approximately one year. He has not attended any in-patient program. He asserts that his sobriety is enforced by his own willpower and his occasional contact with on-line support groups.
>
> While [Christa] may have been aware of [James'] drinking at the time of the entry of the Decree, it is not likely that she anticipated a circumstance where [James] would drive a vehicle with one of his children in it while intoxicated. The Court is satisfied that [Christa] has met her burden of proof regarding a material and substantial change of circumstances

having occurred since the entry of the Decree. Specifically, the Court finds that the scale of escalation of [James'] alcohol use was not anticipated at the time of the entry of the Decree.

After considering the best interests factors, the court found that "the greater weight of the evidence shows that [Christa] should receive primary physical custody of Conner subject to [James'] parenting time." The court further found that Christa had a legitimate reason to relocate with Conner and, after considering the factors set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), that the factors weighed in favor of granting Christa's request to remove Conner and that relocation was in Conner's best interests.

James now appeals from the district court's order modifying custody and granting Christa's application to remove Conner from the State.

## III. ASSIGNMENTS OF ERROR

James assigns, consolidated, renumbered and restated, that the district court erred in (1) finding that Christa met her burden of showing a material change in circumstances; (2) analyzing the best interest factors in determining that a change in custody was in Conner's best interests; (3) considering reasons not pled in Christa's application for removal; (4) finding that Christa met her burden to prove there was a legitimate reason for removal, in weighing the *Farnsworth* factors, and finding that removal was in Conner's best interests.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

In child custody cases, where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015).

Questions concerning relocation and custody are initially entrusted to the discretion of the trial court. Although reviewed de novo on the record, the trial court's answer to such questions will ordinarily be affirmed absent an abuse of discretion. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021).

## V. ANALYSIS

James generally assigns that, as to a change in custody, the district court erred in finding that Christa met her burden to prove that there was a material change in circumstances affecting Conner's best interests and that modification of custody was in Conner's best interests. As to Christa' request to remove Conner from Nebraska to Wyoming, James argues that the district court erred in finding there was a legitimate reason to remove Conner and in finding that removal was in Conner's best interests. Before we analyze the separate assignments, we must first analyze the legal framework upon which modification of custody and removal are analyzed in these situations.

Ordinarily, custody of a minor child will not be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). It is the burden of the party seeking modification to show a material change in circumstances. *Id*. Specifically, the movant must show two elements: First, that since entry of the most recent custody order, there has been a material change in circumstances that affects the child's best interests, and second, that it would be in the child's best interests to change custody. *Id*.

However, when a party requests modification of custody from joint custody to sole custody along with a request to remove the child to another state, the analytical framework is somewhat different. In *Bird v. Bird*, 22 Neb. App. 334, 342-43, 853 N.W.2d 16, 23-24 (2014), this court stated:

> The application of these standards is slightly different in cases where, as here, the parent seeking removal does not have sole custody. When a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so. See *Brown v. Brown, supra*. Proving such an intent does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances. *Id.*

> Once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined. *Id.* The question becomes whether the best interests of the child are furthered by the relocating parent's obtaining sole physical custody and moving the child out of state. See *id*. As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocation. *Id*.

In deciding that case, this court relied on *Brown v. Brown*, 260 Neb. 954, 963, 621 N.W.2d 70, 78 (2000), wherein the Nebraska Supreme Court stated:

> To require that a parent, seeking leave to remove a child from the state, must prove a material change of circumstances beyond a legitimate reason and intent to move would (1) deny a parent with joint legal and physical custody the opportunity to seek leave to relocate prior to some change in another, unrelated circumstance, and (2) would have the effect of sentencing such a parent to immobilization. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994) (award of custody not to be interpreted as sentence to immobilization). Furthermore, such a rule would encourage parents to change the circumstances by moving without permission, presenting the court with a fait accompli demanding consideration of the issue. See *Jack v. Clinton, supra* (discouraging temporary relocation prior to ruling on permanent removal).

Because this case presents a request to change custody and removal, we consider James' assignments of error in light of the standard as set forth above.

## 1. Material Change in Circumstances

James first assigns that the district court erred in finding that Christa satisfied her burden to prove a material change in circumstances affecting Conner's best interests and a legitimate reason to remove Conner from Nebraska to Wyoming. James generally argues that none of Christa's allegations in her complaint to modify and request for removal amount to a material change in circumstances or a legitimate reason to relocate.

When a parent with joint custody requests both a change in custody and permission to remove the child, as the Nebraska Supreme Court noted in *Brown, supra*, using the normal modification framework, the situation would require a parent seeking to leave the State to prove a material change in circumstances beyond a legitimate reason and intent to move. As such, under those circumstances, the Supreme Court indicated a legitimate reason to leave and move can, in and of itself, constitute a material change in circumstances. But here, the reason Christa sought to leave was based upon what she alleged was a material change in circumstances. That is, James' escalation in drinking placed Conner at risk of harm thereby necessitating a change in custody and her removal of Conner from Nebraska to Wyoming in order to better accommodate her ability to serve as Conner's sole custodian. On this record, we agree.

James argues that the complaint to modify had nine separate allegations of material changes in circumstances, but that Christa only presented evidence of his drinking in 2021 and early 2022, which he argues was a "transitory/temporary condition that [he] does not deny." He further argues that Christa knew of his drinking problem at the time of the decree and that he was sober by the time she filed her complaint to modify, that he had taken a new job where he was home each night, and that he was exercising parenting time as awarded in the initial dissolution decree.

James also argues that Christa's move from Cheyenne to Kimball was not a material change in circumstances and that none of the grounds alleged in her request for removal constituted a legitimate reason for removal. He contends that Christa's reasoning, that her extended family lives in Cheyenne, is not by itself enough to constitute a legitimate reason; that Christa did not demonstrate any career advancements because she plans to commute to the same job in Kimball; that Conner's access to health care is not limited in Kimball because there is a small clinic and hospital there; and that Conner does not suffer from any chronic health issues requiring specialty care.

Here, the district court found that Christa proved a material change in circumstances in that the evidence showed that since the initial decree, the "scale of escalation of [James'] alcohol use was not anticipated at the time of the entry of the Decree." The court further found that Christa proved a legitimate reason for removal in that

> The undersigned does not doubt that [Christa's] familial connections to Cheyenne are greater than those she enjoys in Kimball. [Christa] has no connection to Kimball except for her work, Conner, and [James]. [James] is not from Kimball although his parents have moved to Kimball since Conner was born. [Christa] was residing in Cheyenne at the time the Court entered the Decree in this matter. She relocated to Kimball to be closer to Conner after [James'] drunk driving arrest in 2021. [James'] other son resides with his mother in Cheyenne as well.

[Christa's] parents' residence is set up with a full[y] finished basement with two bedrooms, a separate kitchen and private bathroom. [Christa] testified that she would have more space there [than in] her current apartment. Conner is in preschool but not yet in regular fulltime school so relocation at this time would have limited impact on his education. [Christa] asserts that there are greater opportunities for Conner in Cheyenne for extracurricular and educational activities. In that respect the Court notes that there are fairly robust extracurricular activities available for children in Kimball and that any "greater" opportunities available in Cheyenne are due to volume of children not necessarily quality of programming.

Regardless, the Court cannot find that [Christa] does not have a legitimate reason to relocate.

Based on our de novo review of the record, it appears Christa resided in Cheyenne at the time the initial decree was entered by the district court. She only returned to Nebraska out of concern for Conner's safety due to the escalation in James' alcohol consumption, his arrest for DUI with a child passenger, and his reckless supervision of Conner and James' other child during periods of extreme intoxication. We also note that Kimball and Cheyenne are approximately 64 miles from each other, the parties previously accommodated their joint custody arrangement within the confines of their prior living arrangements, James' other child also resides in Cheyenne, and Conner has a good relationship with his half-brother in Cheyenne. Because of the risks attendant with James' conduct, Christa desired to return to the place she was living at the time of the initial decree to be in close proximity to her family, who have a great relationship with Conner and who could provide support for both Christa and Conner. Although James testified that he currently has his drinking under control, we cannot find the district court abused its discretion in finding that James' conduct constituted a material change in circumstances. Likewise, we cannot find that Christa's reasons for seeking removal did not constitute a legitimate reason to leave Nebraska and return to her former residence so as to better accommodate Christa's ability to parent Conner as his sole custodian. James' assignment that Christa failed to present a change in circumstances that justified her desire to remove Conner fails.

## 2. BEST INTERESTS

James next assigns that the district court erred in finding that modification of custody and removal of Conner from Nebraska to Wyoming were in Conner's best interests or finding that James was unfit.

Whether we are considering a modification of custody or a proposed removal from the state, the paramount consideration is in the best interests of the children. *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014). In determining whether removal to another jurisdiction is in the child's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent. *Id*. We will address each of these considerations in turn.

### (a) Each Parent's Motive

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *Welch v. Peery*, 26 Neb. App. 966, 925 N.W.2d 375 (2019).

The evidence reveals that Christa's primary motive in seeking removal is to return to her home in Cheyenne where she was residing at the time of the initial dissolution decree. The only reason she left Cheyenne was to help James with Conner due to James' alcohol addiction and his inability to care for Conner at that time. Christa testified that she was born and raised in Wyoming and that all of her family lives in Cheyenne. James testified that he opposed James' removal from Nebraska because he believed it would negatively impact his relationship with Conner.

Based on our devo review of the record, we find that both parents have valid reasons for and against the removal of Conner to Wyoming.

### (b) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living condition' would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Welch v. Peery*, 26 Neb. App. 966, 925 N.W.2d 375 (2019). This list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. *Id.* Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.*

Here, in considering the best interests factors, the district court noted, among other things, that Conner enjoys a healthy and happy relationship with both Christa and James; that Conner was healthy and active and both parents have the ability and interest in meeting Conner's healthcare needs; that both parties had demonstrated a capacity to meet Conner's physical care and educational needs; that Conner was accustomed to seeing and spending time with both of his parents regularly even after the parties' divorce; and that a change in custody would necessarily impact the relationship between Conner and James. However, the court found that there was credible evidence of neglect of Conner by James as a result of his alcohol use; that James' alcohol consumption and interactions with others, including Christa and Conner, reflected on the issue of James' moral fitness; and that Christa's home environment was more stable than James' home environment. The district court found that the factors that weighed in favor of Christa's application to remove were Conner's emotional, physical, and developmental needs and the degree to which housing or living conditions would be improved. Specifically, the court placed greater weight on the concerns associated with James' escalated alcohol use.

Based on our de novo review, we note that Christa testified that James struggled with alcohol use prior to the parties' meeting 8 years ago. She testified that she would "classify [James] as a binge drinker" because "there would be months and months and months where he wouldn't touch any alcohol and then there would be, when he had that first drink he couldn't stop for a while . . ." She stated that the longest period of time that she knew James to be sober was about 8 months. Although Christa acknowledged James' history of struggling with alcohol, she testified that new concerns arose following the entry of the divorce decree, including that James had left Conner home alone to go to the bar, that James had opted out of parenting time so he could drink, that Christa received a phone call from James' mother a month after the entry of the dissolution decree because she had concerns for Conner's safety due to James being intoxicated, that James had passed out from intoxication while caring for Conner, and that James had been arrested for DUI with a child passenger.

James acknowledged that he had issues with alcohol, that the divorce "hit [him] hard," and that he was depressed. James further admitted that following the entry of the initial dissolution decree, he was arrested and sentenced to a term of probation for DUI with a child passenger. Although James alleges that his arrest "really hit hard," he admitted that he continued to drink alcohol following his arrest and sometime thereafter sought treatment with medication to help him abstain from alcohol. James also did not dispute the allegations that he had been intoxicated while Conner was in his care.

The evidence established that James was abusing alcohol while Conner was in his care, that James drove intoxicated with a child in his vehicle, and that he was unable to provide Conner with a safe environment. Although James and Conner share a good relationship with each other, and it does not appear that Conner has suffered physical harm as a result of James' alcohol abuse, the potential for harm was certainly present. Further, although James testified that he had been sober for almost a year at the time of the trial, the potential for harm continues in that, although James alleges he has and will maintain his sobriety, he has failed to consistently seek treatment through counseling or A.A. and he has demonstrated a pattern of ongoing alcohol abuse. His primary method of treatment is a prescription medication which the testimony shows is the same form of treatment he was utilizing when he relapsed previously. Based upon James' own testimony regarding his long history of alcohol abuse, and his inability to appropriately care for Conner's emotional, physical and developmental needs, this factor weighs in favor of removal. We determine that the court did not abuse its discretion in finding that Conner's quality of life was enhanced through a change in custody and allowing Christa to return to Cheyenne.

(c) Impact on Noncustodial Parent's Contact With Child

The third factor in the best interests determination is the impact of the move on the contact between a child and the noncustodial parent, when viewed in light of reasonable visitation arrangements. *Welch v. Peery*, 26 Neb. App. 966, 925 N.W.2d 375 (2019). This consideration focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship. *Id.* Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining

reasonableness. *Id.* Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Id.*

Here, the initial dissolution decree awarded the parties joint physical custody on a week on/week off basis even though Christa resided in Cheyenne and James resided in Kimball. The parties were successful with the parenting time arrangement as ordered until James began actively struggling with his alcohol addiction. Both parties generally testified that they were able to make accommodations to the parenting time schedule as needed and that they tend to coparent well. Cheyenne is only 64 miles from Kimball and both parties regularly travel between Kimball and Cheyenne.

In awarding primary physical custody to Christa and in fashioning the parenting plan, the district court awarded James parenting time every other weekend to coincide as much as possible with his visitation with his other child who also resided in Cheyenne, holiday and summer parenting time, and telephone parenting time at least twice a week.

Based on the testimony that the parties generally share a cordial coparenting relationship, the short distance between Cheyenne and Kimball, and the district court's award of parenting time, we find that the parenting plan provided a reasonable visitation schedule that will continue to foster a meaningful relationship between James and Conner. In considering the factors above, we cannot find that the district court abused its discretion in finding that it was in Conner's best interests to modify primary physical custody of Conner to Christa or in granting Christa's request to return to Cheyenne.

## VI. CONCLUSION

Having found that the district court did not abuse its discretion in finding that a material change in circumstances as evidenced by a legitimate reason to relocate existed and that it was in Conner's best interests to modify custody and permit Christa to return to Cheyenne with Conner, we affirm.

AFFIRMED.